May it please the Court, my name is Samuel Mina. I'm representing Petitioner Dorcas Morithia. Could you pull the mic right up close there and speak up? Thank you. I would request that I set aside two minutes of time for rebuttal. That would be fine. Thank you. Morithia applied for asylum but was denied by the IJ for a lack of credibility. The IJ also went on to hold that even if she were found to have been credible, he would have denied her for change in circumstances. The Board, assuming that Morithia was credible, denied her once again on change in circumstances. Because of the passage of time since this case was brought before the Court, I'll focus mainly on the second claim, which was a female genital mutilation related claim. Is there anything to prevent you on behalf of your client to ask once again for reopening before the BIA, irrespective of what happens here today? I would say yes. I don't believe there's been a change of circumstances with regard to the FTM claim. And with respect to the politically based claim, the government that was or the party that was in power at the time of the decision is still in power at this time. The reason I ask that is I just had occasion to read a couple of United Nations reports about increased violence, recent increased violence against, is it Kikuyu? Kikuyu, yes. Yes. And in the region where your client lived. That may be true. However, there has been ongoing violence within that area in the Rift Valley. Additionally, there was an increase in violence immediately after the last elections in 2007. I believe there's been a decrease since that time. And there's an election coming up in 2012? 2012, correct. And isn't there anticipation of violence in connection with that? I believe since the onset of multi-party elections in Kenya, there's been violence associated with each and every election since that time. Well, this is your client and your claim. But one of the problems in the immigration process is we take a snapshot in time. Yes. And we have to look at that snapshot. We can't look outside it. But that's for you and your client to decide whether to reapply in the event that you're not successful here. But go ahead with your argument. Thank you. The board also denied, based on the female genital mutilation-related claim, essentially relying on the Department of State country reports that indicated that the government of Kenya has banned forcible FGM against women of all ages, that there's a ban in government-controlled hospitals and facilities, and that the usual age of FGM is at a younger age than of Petitioner. Petitioner's position is that the ban on FGM in Kenya is not to be equated to an eradication of FGM. Excuse me, counsel. Putting aside the issue of what the government has done and whether the law is enforced, my understanding is that your client, the only issue she had at one point was that her former husband's female family members wanted her to undergo the procedure. She resisted that. She did not have it happen. She's divorced now from the man whose relatives wanted to do this. She also has a sister who remains in Kenya and has never had any problem. Are either of those facts incorrect? I think they're both partially correct. Her sister did have a problem, and in fact my client had a problem. She testified after she finished high school in 1998, her family attempted to have her undergo the procedure forcibly. She and her twin sister. Both of them managed to run away. She also testified that since that time her sister has been able to avoid undergoing the procedure, simply because she's been moving from place to place. Now, one of the things that I wondered about, the fact that the sister moved from place to place, I don't think is too much of an excuse, but in the area where she, where her family resided, I understood that from the facts that 80 to 90 percent of the women there had undergone female genital mutilation. Is that correct? According to the Department of State, that is correct. They mentioned that within certain districts within the Rift Valley, the rates were as high as 80 to 90 percent. They did not specify which districts, though. I thought they didn't specify it was the district in which she lived? She did live within Rift Valley, but they did not specify specifically. I believe they said the Nyanza province and a few other provinces within Rift Valley. How large is the Rift Valley? I don't believe there's anything in the record I can cite to. It's a rather large swath of Kenya, however. It's as large as California, isn't it? It's large. I believe the population of Kenya is somewhere between 30 and 40 million, and a large percentage of them reside within the Rift Valley. With respect, counsel, it seems like your argument, at least as stated in the briefs, it seems like you're suggesting that because some women undergo this horrific procedure against their will in Kenya, that your client is at risk and therefore there is a reasonable probability of future persecution. Is that, in fact, your position? That is our position, and it is so because, as the record indicates, within the Kikuyu tribe approximately 43 percent of the women undergo this procedure. But doesn't your client under the law bear the burden to show that she particularly has a reasonable fear of persecution? Obviously the procedure did not happen before. She was able to avoid it. She's older now by standards of this horrendous procedure. There's a law that says you can't do it. The government is headed by the man who headed the party that resulted in the earlier persecution of her father and family members. So things have changed radically. As you know, an experienced lawyer in this area, we regularly have cases that come before us where there are some really awful things that are stated, but sometimes things change and we have to rely on the country report to analyze whether there is, in fact, a realistic possibility of future concern. And our question here is, was there substantial evidence to support the determination of the BIA in this area? And although I have great empathy for your client, I'd like you to help me, if you can, to show me how the BIA was wrong here. I don't see it. Okay. I would agree that there's been a change with respect to the political claim. With respect to the mutilation claim, I would think that there's substantial evidence to overturn that decision. So it gets back to the point that I've mentioned before, and that is that your belief is if there's any FGM occurring in Kenya, anywhere that your client has met the burden, is that the position you're taking? No. No, I don't believe that. I think that's, even for me, that would be overstretching the point. But I believe the board passed on a case in the Seventh Circuit, Agbor v. Gonzalez, that was very similar. The analysis was very similar. There, the board found that there was low incidence of FGM throughout Cameroon, that the government had expressed opposition to it, and that the age at which the procedure usually took place was substantially younger than the Petitioner's age in that case. And that doesn't help your client, though, does it, the Seventh Circuit case? It's the Seventh Circuit case, but the analysis that the board employed, I think, could be helpful to this Court, because they're very similar. And in the Seventh Circuit case, and this case is cited by the government, the Seventh Circuit overturned that decision, finding that even a 3 percent chance of FGM within Cameroon, when you put that in terms of numbers, that's over a quarter of a million women. What is the name of the case in the cite, please? The case is Agbor v. Gonzalez. Say that again, please. Agbor, A-G-B-O-R. Okay. And versus Gonzalez, do you have a cite? Yes, 487, Fed 3rd, 499. Is this in your brief? It's part of the government's supplemental authorities. Okay. Did you say 47? The mic's not very good. I'm sorry. 487, Fed 3rd. 487. Yes. Fed 3rd, 499. 499. Okay. That was May of 2007. Okay. Thank you. Yes. One of the problems that I have, and maybe you can help me on this, I think at the time your client was about 30 years old? She was 20 years old. No, no, but at the time of the hearing. Oh, she was approximately 20. Let's see. She was born in the 1980s, so I'd say mid-20s. Yes. Well, she's about 30 now. She's about 30, yes. I'm sorry. And the biggest risk is of young people, particularly children. And how does that play into your position that the government's articulation that she doesn't have this great risk and she should not remain in this country? How does that work out? I would agree that the procedure is usually performed at a younger age. However, I don't believe that that language means that it's exclusively performed at a younger age. She did testify that the first time that this was attempted to be perpetrated upon her, she was 20. She testified that her elder sister was forced to undergo the procedure once she was married. And pointing to the Agbor case, the analysis there is very similar. In that incident, the Petitioner also was 25 years old at the time that she was forced to press her to undergo FGM. Well, you know, if there's a risk, it would mean that every woman that came from countries where they practice FGM would really be entitled to stay in this country because of the risk. And it has to be more of an individualized analysis than a generalized one. Do you agree? I agree, but I believe in this incident, in this instance, the Petitioner comes from a tribe that practices this at almost a 50 percent rate. Throughout the country, the incidence of FGM is about 38 percent. And within her region, it's estimated between 80 and 90 percent. So I don't think this is a... Well, that's what I asked before. You say, you said, I asked about the 80 to 90 percent, and that's in her region? Yes, within the, certain districts within the Rift Valley. Oh, within that valley. It's not necessarily where she lives, though. Not necessarily where she lives. However, the tribe that she belongs to does practice this at a 43 percent rate, which is actually higher than the rate of the nation. Okay. You're well over your time. I appreciate it. Thank you. Thank you for your argument this morning. Thank you. We'll hear from the Attorney General at this time. Ms. Drucker? Good morning. You had me worried at first. I thought maybe I was the Attorney General. That's your client. I know. Just a little joke. My name is Allison Drucker, and I'm here representing the United States. Well, as you know, the IJ and the Board did not approve of the Petitioner's request to deny the petition in this case on three different grounds. That is, the case that gave rise to this petition. One certainly is the denial of asylum and withholding for FGM. There's been some discussion this morning about the statistics and the prevalence of FGM in Kenya, and I think it bears noting that in all the cases that the FGM petitioner has denied, these statistics are being put forward, they're aggregates, they're covering large ranges of geography, in some cases tribal groups, and perhaps most significantly, ranges of time. If you are getting statistics on a group of women, and some of them are 50 or 60 years old, but some of them are 10 years old, the likelihood in many African countries, and I think this comes out in the record, is that the older women are much more likely to have been subjected to FGM than the younger, because of the kind of changes that are going on socially, and because of changing positions in the policies and laws of the government. In this case, we believe that there's two reasons why the petitioner did not carry her burden of proof on this issue, and I want to mention that it is her burden of proof. There was no finding by the IJ or the board here of past persecution due to FGM. So we don't have presumption of well-founded fear, and the burden remains on the petitioner by regulation. This is an IJ who has a denial rate of about 71, 72 percent. The national average is about 50 percent. I'm not sure, Your Honor, and I'm not really sure about what cases come before this immigration judge, and so forth. But there is a website that gathers that information. It's publicly available, and this is an immigration judge who denies asylum request, asylum relief at a rate about 20 percent higher than national average. Should we take that into consideration? I think that this case needs to be decided on the record. My understanding is, I mean, in the statute, the courts of appeals are instructed to decide cases on the administrative record in front of them, so that would be what I think you should decide upon. So if we were reviewing the work of an IJ who denied 100 percent of the asylum claims that came before her, we should ignore that? I think if there's questions about the propriety of what an immigration judge is doing, there are internal mechanisms in the department, and maybe that should be addressed and looked into, but I don't think that, as I said, I think that the job of the court is to decide on the record. Counsel, I'm unfamiliar with the information that Judge Hawkins refers to, but dealing with this particular issue, at least according to our law, my understanding is that we look at the record that has been developed here, and as an appellate court, we determine whether there is substantial evidence to confirm the decision of the IJ, whether the IJ is a good IJ or a bad IJ. We've had lots of the latter categories, and the department, I know, is trying to make some changes. But we're nonetheless stuck with the record, and the Petitioner is stuck with her burden to show evidence here. And as I understand it, the government's argument is that there was no showing of past persecution, and therefore, without that predicate, she can't win on this point. Is that a correct understanding? Well, both the immigration judge and the board made no findings about past persecution. Now, that doesn't mean that she can't win a claim of well-founded fear. She can demonstrate well-founded fear. It just means that there's no presumption, so that the burden of proof in this case remains on the Petitioner. Let me put this question to you. If in a particular tribe, an area, more than 50 percent of the women have undergone FGM, isn't that enough to put every woman in the position of saying she has a well-founded fear of persecution for FGM, even though it has never been, she's never been faced with the actual problem of being mutilated? That's what bothers me a little bit. What do you say to that? I don't think that's the case for two reasons. One reason is I think the law in this circuit is quite clear that this is an, it has to be an individualized determination, and as has already been discussed here in this case, the Petitioner is over 30 years old. There's material in the record at page 269 that says that most FGM is done to girls ages 3 to 13. No, is this, did you say no? I'm sorry? Did you say no FGM is done? I didn't get yours. Oh, no, I said generally FGM is done to girls ages 3 to 13. This woman is now over 30 years old. She's also, she's divorced, and she's a mother. Basically, I mean, the record is all clear on this. And also, when she describes the dangers that she experienced back in Kenya personally about FGM, I mean, initially, at one period, she was living at home with her family. And so, but now, she said herself, she testified that she hasn't had any contact with her family, except e-mails with her family. She hasn't had any contact with her twin sister since she came to the U.S., so she's become independent of them. This is at AR 179. Also, she testified that she was divorced in December of 2003. That's at AR 147. And she hasn't had any contact with her husband, and I'm sure that means her in-laws as well. They were the ones who then tried to convince her to have FGM later. And that's at AR 182. So that's all one aspect about why she individually shouldn't be considered to be at such great risk. The other point is about the government and the changes that are occurring over time that I mentioned before. Both the board and the immigration judge cited two materials that were in the record, the country report, which is Exhibit 6, and that talked about the law prohibiting FGM for young women and also women of any age forcibly, as well as several presidential decrees. And that's at AR 179.  And that's at AR 147. Excuse me. The IJ hearing was in 2004? I don't think there's anything about that in the record. The record does discuss an election in December of 2002. Assume for the purpose of the question I'm about to ask you that there was an election in 2007, okay? You agree? Can you assume that? I'd like to see where you're going with this. You're going to find out. We have some case law, and I'm thinking in the case of Indo-Fijian asylum applicants, where panels have, because Fiji has experienced a situation where there's a coup and then things settle down and then there's another coup and things settle down. I think they've had four or five who are native Fijians rise up after a legitimate election establishing the Labor Party in government. But in any event, panels have sent matters back to the BIA to examine the current country conditions. My information from published reports is that following the 2007 election, 800 members of this woman's tribe were killed. 600,000 Kenyans were displaced, almost entirely on political and ethnic grounds. And the main target was her ethnic group, and most of this action occurred in or near the area where she once lived. Now, if that's correct, and I understand it's not part of this record. That's right. Why shouldn't we send this back to the BIA to look at the current, current conditions? First of all, she, any applicant would come under the regimen of motions to reopen rather than remanding. So I think there's some question about whether the court should be using that as a mechanism for remanding. For dealing with new evidence. But further, I'd like to say that actually, she never made a claim of ethnicity. She made two claims. One was particular social group relating to FGM, and the other one was political opinion. And if you read the record, all the incidents are described as my family, my father, my brother, myself, we were members of the BIA. And I take it your response is that counsel for petitioner is perfectly free to apply to reopen with the BIA and bring this kind of information to their attention. They can certainly attempt to do that, and say that there's changed conditions or whatever, and make their shot. I just have one more question, if I may. My understanding of the record, I'm thinking particularly of AR 245, was that the Malawi Kabaki, I'm not sure I'm saying it right, was elected president in 2003, and his party still remains in power. Is that your understanding? That seems to be petitioner's understanding. I also understood, and I'm going to ask him, I got the impression when opposing counsel was before us in making argument that in effect he was not pursuing the political opinion portion of the claim. I'm going to ask him that. Is that your understanding as well? I thought that was what he said. That was my understanding of what he said. Thank you, Your Honors. Well, let me ask it. I had the impression that you had said previously that you were not pursuing the political opinion claim. Is that correct? That is correct, Your Honor. I'm not sure that the case is open after our court decides this case is a separate issue. But for purposes of this proceeding, we're really considering the FGM claim. That's correct.
judges: Bright, Hawkins, Smith M.